UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

AIR TRANSPORT ASSOCIATION OF
AMERICA, INC. d/b/a AIRLINES FOR
AMERICA,

               Plaintiff,

        v.

NICOLE BLISSENBACH, in her official
capacity as Commissioner of the
Department of Labor and Industry,

               Defendant.

Case No.   24-cv-04657_____

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

_____

       1.    Plaintiff Air Transport Association of America, Inc. d/b/a Airlines for America ("A4A"), by and through its undersigned counsel, brings this Complaint for Declaratory and Injunctive Relief against Nicole Blissenbach, in her official capacity as Commissioner of the Department of Labor and Industry ("DLI"), and alleges upon knowledge with respect to itself and its own acts, and upon information and belief as to all other matters, as follows:

       2.    The Minnesota Earned Sick and Safe Time Law (Minn. Stat. §§ 181.9445-48) (referred to herein as the "Minnesota Law"), as applied to the Airlines,[1] is preempted by the Airline Deregulation Act of 1978 (49 U.S.C. §§ 41701-41726) (the "ADA") and the Railway Labor Act (45 U.S.C. §§ 151-188) (the "RLA").   The Minnesota Law

_____

[1]    A4A's member carriers as a group are referred to herein as the "Airlines," and any one member carrier is referred to as an "Airline."

comprehensively regulates when and how Airline employees can be absent from work. For example, the Minnesota Law (i) requires that employers in Minnesota annually provide up to 48 hours of earned sick and safe time ("ESST") for a broad range of reasons, (ii) prohibits employers from requiring an employee to provide documentation that ESST was used for an authorized purpose (*e.g.*, doctors' notes), and (iii) prohibits employers from factoring ESST use into any absence-control policy or attendance point system. Even beyond the 48 hours of ESST mandated by the Minnesota Law, the Minnesota Law requires that, beginning January 1, 2025, any paid time off made available by an employer in excess of the mandated 48 hours must also meet the comprehensive standards and restrictions of the Minnesota Law. In these and other ways, the Minnesota Law undermines the Airlines' generous and carefully crafted collective bargaining agreements ("CBAs") and company policies, which strike a balance between employee needs and the complexities of operating a 24-hours-a-day, 7-days-a-week nationwide network of air transportation.

3. The Minnesota Law, as applied to the Airlines, is preempted by the ADA. The ADA "largely deregulated domestic air transport," *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 222 (1995), "to promote 'efficiency, innovation, and low prices' . . . through 'maximum reliance on competitive market forces,'" *Nw., Inc. v. Ginsberg*, 572 U.S. 273, 280 (2014) (citation omitted). To "ensure that the States would not undo federal deregulation with regulation of their own," *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 368 (2008) (citation omitted), the ADA preempts state laws "*related to* a price, route, or service of an air carrier." 49 U.S.C. § 41713(b) (emphasis added). The Supreme Court recognizes that this language expresses a "broad pre-emptive purpose." *Morales v. Trans*

2

*World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992).  Here, the Minnesota Law, as applied to the Airlines, is preempted by the ADA because it "relate[s] to" and has a "significant impact" on the Airlines' "price[s], route[s], or service[s]."  49 U.S.C. § 41713(b); *Morales*, 504 U.S. at 384, 390.   Among other things, paid sick and safe leave laws, like the Minnesota Law, have caused and/or will cause an increase in employee absences, including because of an increase in employee use and abuse of sick leave, which in turn has had and/or will have a significant impact on the services provided by the Airlines, including and up to causing and contributing to flight delays and cancellations.

4.     The Minnesota Law, as applied to the Airlines, is also preempted by the RLA because it impermissibly "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), when it enacted the RLA to stabilize labor-management relations in the nation's vital transportation industries and thereby to prevent interruptions to interstate commerce.  The Minnesota Law frustrates the congressional objectives by, among other things, (i) imposing a pervasive scheme of regulation with respect to numerous aspects of the working relationship between Airlines and their employees, in derogation of the terms of CBAs carefully negotiated over long periods of time between the Airlines and the unions representing Airline employees; (ii) mandating through legislation specific terms and conditions of employment for Airline employees, which their unions have been unable or unwilling to achieve through the collective bargaining process, thereby circumventing the collective bargaining process and depriving the Airlines of the opportunity to obtain the benefit of their bargain for providing employees more generous terms of employment than

the Airlines have previously agreed to provide; (iii) effectively altering existing CBAs by requiring the Airlines to comply with the Minnesota Law's requirements for certain types of leave that the Airlines provide their employes above and beyond the minimum hours required by the Minnesota Law, even though the Minnesota Law's requirements are inconsistent with the terms of the CBAs; (iv) delegating to unions the unfettered authority to determine whether Airlines must comply with certain aspects of the Minnesota Law; and (v) expressing in multiple ways an affirmative preference for union representation of employees, rather than remaining neutral as Congress envisioned in its enactment of the federal labor laws.

## NATURE OF THE ACTION

5.     A4A seeks a declaration, pursuant to 28 U.S.C. §§ 2201-2202, that the Minnesota Law in its entirety, as applied to the Airlines:

    (a)     is preempted by the ADA because the Minnesota Law relates to and has a significant impact on the Airlines' prices, routes, and/or services, and is therefore unenforceable by virtue of the Supremacy Clause of the United States Constitution; and

    (b)     is preempted by the RLA because the Minnesota Law creates an obstacle to the full effectuation of the collective bargaining process, thereby thwarting the purposes of Congress in enacting the RLA, and is therefore unenforceable by virtue of the Supremacy Clause of the United States Constitution.

6.     A4A also seeks a permanent injunction prohibiting enforcement of the Minnesota Law against the Airlines.

## THE PARTIES

7.    Plaintiff A4A is a nonprofit corporation organized under the laws of the District of Columbia, with its principal place of business in Washington, D.C.  A4A advocates on behalf of ten federally regulated air carriers, which include seven passenger carriers, Alaska Airlines, Inc. ("Alaska"), American Airlines, Inc. ("American"), Delta Air Lines, Inc. ("Delta"), Hawaiian Airlines, Inc. ("Hawaiian"), JetBlue Airways Corp. ("JetBlue"), Southwest Airlines Co. ("Southwest"), and United Airlines, Inc. ("United"), and three cargo carriers, Atlas Air, Inc. ("Atlas"), FedEx Express ("FedEx"), and UPS Airlines ("UPS").  As of October 2024, U.S. airlines employed over one million workers across the globe, including more than 752,000 full-time equivalent workers and 269,000 part-time workers.[2]  Commercial aviation supports 5% of U.S. gross domestic product and more than 10 million U.S. jobs, including more than 130,000 jobs in Minnesota.[3]  Commercial aviation also contributes more than $10 billion annually to Minnesota's gross state product.[4]

8.    Among other things, A4A advocates for the Airlines on issues of safety, security, customer service, environment, energy, taxes, and economic growth.  A4A also works with the Airlines in legal, political, and regulatory arenas to foster a business and

---

[2]    Bureau of Transportation Statistics, U.S. Dep't of Transp., https://transtats.bts.gov/Employment/ (last visited December 30, 2024).

[3]    *See* The Economic Impact of U.S. Civil Aviation: 2020 at 10, Fed. Aviation Admin. (Aug. 2022); The Economic Impact of U.S. Civil Aviation on the U.S. Economy at 10, State Supplement, Fed. Aviation Admin. (Nov. 2020) (hereinafter *State Supplement*).

[4]    *See State Supplement, supra* n. 3, at 10.

regulatory environment which promotes a safe, secure, and financially stable airline industry in the United States.

9.      All of the Airlines are federally regulated air carriers, and many operate domestic and/or international flights daily into and out of airports in Minnesota (including the Minneapolis-St. Paul International Airport  or "MSP").

10.      Defendant Nicole Blissenbach is the Commissioner of DLI and named as a Defendant in her official capacity.  In her official role, she is charged with enforcement of the Minnesota Law.  *See* Minn. Stat. § 177.27(4)-(5).

## JURISDICTION AND VENUE

11.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, because A4A's claims arise under the ADA, the RLA, and the Supremacy Clause of the United States Constitution.  *See* 49 U.S.C. § 41713; 45 U.S.C. §§ 151-188; U.S. Const. art. VI, cl. 2.

12.      The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, authorizes the declaratory and other relief sought herein.

13.      A4A has associational standing as an organization to bring claims on behalf of the Airlines for the declaratory and injunctive relief sought herein.  An organization has standing to sue on behalf of its members when:  "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Worth v. Jacobson*, 108 F.4th 677,

685 (8th Cir. 2024) (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023)).

14.     A4A satisfies each of the three requirements for associational standing. *First*, the Minnesota Law is already injuring (and will continue to injure) the Airlines with operations in Minnesota by requiring those Airlines to either (i) take steps to modify the application of sick leave and other provisions of their respective CBAs or company policies, and/or their respective attendance/reliability policies, and/or any doctors' notes requirements, or (ii) face the threat of DLI or private enforcement actions if they do not do so.  These injuries would be redressed by a favorable decision in this litigation because the Minnesota Law would no longer apply to the Airlines.  *Second*, this litigation is germane to A4A's organizational purpose of advocating on behalf of the Airlines to ensure a safe, secure, and healthy U.S. airline industry.  *Third*, neither A4A's preemption claims nor the relief A4A seeks -- a judgment declaring the Minnesota Law preempted and unenforceable as applied to the Airlines, and an injunction barring its enforcement -- requires the participation of A4A's individual members.

15.     Venue is proper in this Court under 28 U.S.C. § 1391(b), as this Court is located in the judicial district where a substantial part of the events or omissions giving rise to A4A's claims have occurred, are now occurring, and will occur in the future; and because Defendant resides in or is found in this judicial district.

## THE AIRLINES' FLIGHT CREW AND THE SERVICES THEY PROVIDE

16.    Each of the Airlines employs thousands of pilots and flight attendants, who work on flights throughout the United States and the world.  Flight crew[5] are highly mobile workers, who do not work regularly scheduled shifts.  The Airlines' flight crew are assigned to a particular airport or "base."  A base, also known as a "domicile," is the airport where flight crew begin and end their work assignments (also called "trips," "sequences," or "pairings").  The Airlines also allow flight crew to transfer between bases from month to month.  At least one A4A member has a flight attendant and pilot base in Minnesota.  Additionally, even Airlines who do not have flight crew based in Minnesota have flight crew who fly through Minnesota (including taking off and landing at MSP).

17.    A flight crew member's "base" is not necessarily located in the same city or even the same state where they live, and it is common for flight crew based in one state to live in another state or even outside of the United States.  Flight attendants and pilots who are based in cities where they do not live are known as "commuters."  Commuters who do not live within driving distance of their base are allowed to fly for free on their own Airline, and sometimes on other Airlines as well, between their place of residence and their base.

18.    Because the flights operated by the Airlines in Minnesota either begin or end in Minnesota, but not both, flight crew based in Minnesota do not spend all of their time working in Minnesota.  These employees spend much of their work time in federally regulated airspace, and they often pass through multiple airports and states in the course of

---

[5]    As used herein, the term "flight crew" refers to pilots and flight attendants.

8

a single day, spending time on the ground in each location to prepare for their next flight or begin a layover at a local hotel until the day of their next flight.

19.     Federal regulations require the Airlines to have a minimum number of pilots and flight attendants on board the aircraft before any passengers may board or the aircraft may take off.  *See* 14 C.F.R. §§ 121.385, 121.391.  Most of the Airlines' flights operate with the minimum staffing level for pilots and flight attendants.

20.     Flight crew provide critical services to the Airlines' passengers to ensure a safe, reliable, and on-time operation.  For example, after boarding, pilots are responsible for the safe and on-time transport of all passengers and crew on board their flights and, among other things, flight attendants are responsible for assisting passengers with boarding, ensuring the safety of and providing service to the Airlines' passengers on-board, and preparing aircraft cabins for take-off and landing.

21.     Thus, both on-time boarding and on-time departures depend on the on-time arrival of pilots and flight attendants at the gate.

## GROUND CREW AND THE SERVICES THEY PROVIDE

22.     Each Airline also employs thousands of ground crew members[6] across the country, often with several hundred or more working at the airports where each Airline has its largest operations.  Many of the Airlines have significant complements of ground crew employees in Minnesota.  Ground crew employees often live near the airport where they

---

[6]     As used herein, the term "ground crew" includes the Airlines' above-the-wing, below-the-wing, and maintenance employees (who are described *infra* to include, among others, ticket counter agents, gate agents, ramp and fleet service workers, cargo agents, baggage handlers, and mechanics/maintenance employees).

work, and are typically considered in three groups: above-the-wing, below-the-wing, and maintenance.

23.   <u>Above-The-Wing</u>.  As a general matter, above-the-wing ground employees work in a customer service role and are typically those employees whom a passenger will encounter when they arrive at the airport or at the gate.  These employees routinely provide services to passengers at the ticket counters and kiosks, at the gates, in premium service clubs, or in baggage service offices.

24.   In particular, the services provided by above-the-wing employees typically include:

(a)   Services at the ticket counters, which include:  (i) checking in passengers;  (ii) checking and processing passengers' bags; (iii) assisting with passenger check-in at the kiosks; and (iv) otherwise assisting passengers with travel bookings and reservations.

(b)   Services at the gates, which include:  (i) making seat-assignment and reservation changes requested by passengers; (ii) assisting passengers with connecting flight information; (iii) assisting passengers with any disability accommodations or issues relating to children or pets; (iv) scanning boarding passes; (v) meeting planes when they arrive; and (vi) otherwise assisting with passenger boarding.

(c)   Services at premium service clubs, which include:  (i) checking passengers into the premium service clubs; (ii) assisting the global, business and frequent flyer passengers with their travel needs, including booking club and conference rooms; (iii) assisting with frequent flyer program enrollment; and (iv) providing food and beverages to club and lounge customers.

(d)   Services at baggage service offices, which include assisting arriving passengers when their bags have been mishandled or are missing, or have arrived early.

25.   <u>Below-The-Wing</u>.  As a general matter, below-the-wing employees largely work on the ramp (*i.e.*, where a departing or arriving aircraft is parked for loading,

unloading, fueling, and servicing) and in baggage rooms, and perform a variety of services (many of which require specialized training and qualifications), including:

(a)    Baggage loading services, which include: (i) working in the bag room sorting, scanning, and loading bags onto the proper baggage carts to ensure they are loaded on the correct aircraft; (ii) transporting bags from the bag room to the aircraft; (iii) loading bags and cargo onto the aircraft; and (iv) ensuring that the aircraft is properly loaded and has a safe weight balance.

(b)    Baggage transfer services, which include transferring bags directly from an arriving aircraft to a connecting aircraft.

(c)    Baggage unloading services, which include unloading bags and cargo from aircraft arriving in Minnesota and delivering the bags to other planes if the passengers have connecting flights or to the carousel for passenger pick up if Minnesota is their final destination.

(d)    Towing services, which include: (i) towing aircraft from gate-to-gate to ensure that the aircraft are in the proper position for their next flight; and (ii) repositioning aircraft from the gates to maintenance hangars or hard stands (often at night). Additionally, during the colder months, this service can include an employee monitoring the repositioned aircraft overnight to ensure that the aircraft stays warm.

(e)    De-icing services, which include de-icing the aircraft in the winter. De-icing is a specialized role that requires employees to complete training.

(f)    Water and lavatory services, which include: (i) ensuring that each aircraft's utilities are ready for the next flight; (ii) servicing the potable water tank on the aircraft; and (iii) removing waste from the aircraft lavatories prior to take off. These services can require specialized training.

(g)    Taxiing services, which include: (i) assisting aircraft to taxi into and out of the gates on arrival and departure, respectively; and (ii) assisting aircraft to safely park at the gates.

(h)    Deplaning services, which include: (i) directing the aircraft to the gate after landing; and (ii) positioning the jet bridge to assist passengers in deplaning the aircraft.

26.    <u>Maintenance</u>.  The Airlines also employ maintenance, mechanic, or "tech ops" employees (collectively referred to as "maintenance" employees).  As a general matter, maintenance employees largely work either at the terminal or in aircraft hangars, and perform a variety of services (nearly all of which require at least some special qualifications and/or training), including coordinating and/or performing maintenance or repairs on aircraft, aircraft equipment, and various ground service equipment.  A significant portion of the maintenance employees' work occurs overnight:  for example, maintenance employees perform scheduled or otherwise required services on aircraft (*e.g.*, engine changes and brake and fuel line repairs) to ensure that the aircraft can be available the next day.  Maintenance employees also respond to issues that arise during pre-flight checks performed by flight and below-the-wing ground crew, many of which must be resolved prior to an aircraft's departure.

27.    The numerous services provided by ground crew are also critical to the on-time boarding and on-time departures/arrivals of flights.

**THE COLLECTIVE BARGAINING AGREEMENTS**
**AND COMPANY POLICIES THAT APPLY TO**
**<u>AIRLINE EMPLOYEES ARE GENEROUS AND COMPREHENSIVE</u>**

28.    The employment terms of the Airlines' flight crew and ground crew are set forth in detailed CBAs and/or company policies.

29.    All of the Airlines operating in Minnesota have CBAs in place for at least some of their employees who work in Minnesota.  American, Southwest, and United each have CBAs with their ground crew in Minnesota and these CBAs are nationwide in scope. Delta has a CBA with its pilots based in Minnesota and this CBA also is nationwide in

scope.  These CBAs are extensively negotiated by the union representing a specific group of employees (*e.g.*, pilots), on one side, and the employer-Airline, on the other side.  For example, the Air Line Pilots Association ("ALPA") is the union representing all Delta pilots, wherever they are based in the nation (*e.g.*, at MSP or another Delta base such as Atlanta).  ALPA, as the representative for Delta's pilots, negotiates the Delta pilots' CBA with Delta.  Paid sick leave and other paid time off has long been the subject of extensive collective bargaining.  Those negotiations and the related Airline policies/practices have reflected a delicate balance between the needs of Airline employees to have paid time away from work and the needs of Airlines to have adequate staffing to provide transportation services 24 hours a day, seven days a week, 365 days a year.  Once a union and Airline tentatively reach agreement on a CBA -- including, but not limited to, provisions relating to paid sick leave and other paid time off -- the union generally submits the proposed CBA to the employees for a membership ratification vote.

30.    Delta's flight attendants and ground crew employees are not represented by unions.  The employment terms for these employees are therefore generally determined by nationwide Delta policies.

31.    The purpose of the CBAs and company policies is to create a uniform set of work rules that will apply to all employees in a given work group (*e.g.*, flight attendants) on a nationwide basis, regardless of where the employees live or work.  In this way, the CBAs and company policies are designed to ensure uniformity, predictability, and fairness across the Airlines' networks in a number of important areas, including (i) scheduling, (ii) trip and shift trading, (iii) vacation, (iv) other time off, and (v) sick time.  These CBA

provisions and company policies also are designed to provide flexible and generous time off options to employees.

32.    *Scheduling*:  The work schedules of the Airlines' employees are generally determined by seniority-based bidding processes.  In the case of flight attendants and pilots, they typically bid for their schedules 30 to 60 days in advance based on dozens of criteria, including the number of days or hours they would like to work in a month, the days they would like to have off, the length of their trips (*e.g.*, trips that span one or multiple days), the cities where they would like to lay over, and the other pilots and flight attendants with whom they would like to fly.  For many of the Airlines, flight attendants and pilots do not work standard 5-day, 40-hour work weeks.  For example, crewmembers at Delta, based on their seniority and ability to work on long-distance flights, may be able to achieve their expected monthly work hours in as few as 10 days per month.  Ground crew typically bid for their schedules based on their preferred work days, days off, shift times, work areas (*e.g.*, ramp, bag room, ticket counter, and gates), and, where applicable, special qualifications.

33.    *Trip and Shift Trading*:  Once their work schedules are initially set by the bidding processes, the Airlines' employees can (and frequently do) trade their trips and shifts with other employees.  For example, United ground crewmembers are able to trade shifts as close to four hours before the shift is scheduled to begin.

34.    *Vacation*:  Vacation amounts vary by seniority, but employees across the Airlines (both flight crew and ground crew) typically accrue between one week of vacation (usually for employees with less than one year of service) to more than a month of vacation

per year.  To ensure that the Airlines maintain adequate staffing levels to safely and reliably operate their networks year round, the Airlines' CBAs and company policies provide detailed procedures by which employees may bid for vacation time.

35.     ***Other Leaves of Absences***:  In addition to vacation time, the Airlines' employees have numerous other ways to take time off from work, including personal, family or medical leaves of absences, and unpaid days off.

36.     ***Sick Time***:  The Airlines provide flight crew and ground crew generous paid sick leave benefits.  For example, pursuant to the CBA, pilots at Delta receive between 50 and 270 hours of sick leave per year, depending on seniority.  Sick leave for Delta pilots can be used only for a pilot's own illness.  As another example, American's, Southwest's, and United's ground employees can accrue eight hours of paid sick leave per month up to 96 hours per year, depending on the workgroup.  At Southwest, employees can accumulate up to 2,400 hours of paid sick leave at a time; at American, employees can accumulate up to 1,600 hours of paid sick leave at a time; and at United, employees can accumulate up to 1,200 hours of paid sick leave at a time.  Ground crew are generally allowed to use accrued sick leave only for the employee's own illness.

37.     With respect to its flight attendants and ground crew, Delta provides them with "Paid Personal Time" ("PPT").  PPT can be used for any kind of absence, including illness, personal, and family needs.  Delta ground employees and flight attendants can accrue up to 56 hours of PPT per year and accumulate 168 hours of PPT.  Scheuduled PPT is time that is away from work and approved prior to the day of the absence.  Unscheduled PPT is time away from work that has not been approved in advance and can only be taken

15

when an employee is too ill to work or they have an emergency need to be away from work, including care of a family member.  If an employee's accrued but unused PPT is more than 168 hours, then the accrued but unused PPT hours are converted into "Certified Time." Employees can accrue up to 150 days of Certified Time, which the employee can use for extended absences, including for illness.

38.    The Airlines also maintain attendance and reliability policies for flight crew and ground crew.  The purpose of these policies is to allow the Airlines to monitor whether flight and ground crews are coming to work when scheduled, to make sure the Airlines are able to properly staff their flights, and to deliver on-time transportation and a satisfactory customer experience.

39.    The attendance policies aim to achieve these objectives with two primary accountability tools:  (i) points systems that can potentially lead to corrective action, and (ii) the ability to request doctors' notes to substantiate employees' use of paid sick leave.

40.    <u>Points Systems</u>:  Most of the Airlines' attendance policies assess points for each occurrence of sick leave or other unplanned absence, with a single "occurrence" potentially spanning one or many days.  The number of points per occurrence can vary based on the amount of notice employees provide for their absence.  For example, the points system for ground employees at Southwest ranges from 0.5 points for arriving late to work to two points for not showing up to work when scheduled.  For ground employees at United, the points system ranges from 0.5 points for arriving late to work to three points for not showing up to work when scheduled without calling in.

16

41.    Ultimately, the points assessed under the Airlines' attendance policies can factor into the Airlines' progressive discipline policies, which typically start with a series of oral and written warnings (but only after less formal counseling has not worked) and can progress up to termination in very rare circumstances.

42.    <u>Doctors' Notes</u>:  In addition to the points systems contained in the Airlines' attendance policies, most of the Airlines can also request a doctor's note if the particular circumstances of an employee's sick call suggest potential abuse.

43.    Given the impracticality of investigating sick leave abuse on a case-by-case basis, some of the Airlines can (and do) require doctors' notes from any employee who calls out sick during certain "critical coverage" periods or during "sick leave emergencies." As one example, Delta can require certification from any flight attendant who calls out on certain holidays, including Thanksgiving, Christmas, New Years, and the Fourth of July. Additionally, Delta, in accordance with the bargained-for terms of its pilot CBA, can require a doctor's note under certain circumstances.

44.    As another example, at Southwest, whenever a "sick leave emergency" or "state of emergency" is declared for a particular employee group -- *i.e.*, when Southwest is experiencing higher than normal sick calls for an employee group that threatens the reliability of its operations -- employees who call out sick are required, with a few limited exceptions, to go to a company doctor to have their illness verified.

## THE MINNESOTA LAW

45.    On or about May 24, 2023, Minnesota Governor Tim Walz signed the Minnesota Law.  The Minnesota Law became effective on January 1, 2024.

46.    The original version of the Minnesota Law exempted flight crew from coverage.  *See* 2024 Minn. Laws. Ch. 127 (H.F. 5247) (excluding from the definition of covered employees "an individual employed by an air carrier as a flight deck or cabin crew member who:  (i) is subject to United States Code, title 45, section 181 to 188; (ii) works less than a majority of their hours in Minnesota in a calendar year; and (iii) is provided with paid leave equal to or exceeding the amounts [required by the Minnesota Law]") (the "Flight Crew Exemption").

47.    In early 2024, members of a union representing one of the Airlines' workgroups testified in support of removing the Flight Crew Exemption from the Minnesota Law.

48.    On or about March 5, 2024, the Minnesota Senate Committee on Labor held a hearing on the amendment to remove the Flight Crew Exemption.

49.    The amendment to remove the Flight Crew Exemption passed both the Minnesota House of Representatives and Senate.  On or about May 24, 2024, Governor Walz signed the amendment into law.  Effective May 25, 2024, the Minnesota Law applied to <u>all</u> Airline employees, including flight crew.

50.    The Minnesota Law imposes a comprehensive and pervasive paid sick and safe leave benefit scheme on employers in Minnesota, including the Airlines.

51.    The Minnesota Law defines an employer as "a person who has one or more employees."  Minn. Stat. § 181.9445, subd. 6.

52.    The Minnesota Law defines "Employee" as "any person who is employed by an employer, including temporary and part-time employees, who is anticipated by the

employer to perform work for at least 80 hours in a year for that employer in Minnesota." Minn. Stat. § 181.9445, subd. 5.

53.    The Minnesota Law requires employers in Minnesota, such as the Airlines, to provide their covered employees with ESST.  Minn. Stat. § 181.9446(a).

54.    Employers in Minnesota must allow covered employees to accrue one hour of ESST for every 30 hours worked, up to 48 hours in a year, "unless the Employer agrees to a higher amount."  Minn. Stat. § 181.9446(a).  ESST "begins to accrue at the commencement of employment of the employee" and "[e]mployees may use [ESST] as it is accrued."  Minn. Stat. § 181.9446(d)-(e).  The Minnesota Law allows employees to use ESST "in the same increment of time for which employees are paid, provided an employer is not required to provide leave in less than 15-minute increments nor can the employer require use of [ESST] in more than four-hour increments."  Minn Stat. § 181.9447, subd. 5.

55.    Generally, an employer must allow employees to carry over up to 80 hours of accrued but unused ESST into the following year.  Minn. Stat. § 181.9446(b)(1).  An employer, however, does not need to allow an employee to carry over their accrued but unused ESST if the employer (i) grants an employee 48 hours of ESST at the beginning of an accrual year and pays the employee for accrued but unused ESST at the end of the year or (ii) grants an employee 80 hours of ESST at the beginning of an accrual year but does not pay the employee for accrued but unused ESST at the end of the year.  Minn. Stat. § 181.9446(b)(2).  The Minnesota Law requires that employers provide "at the end of each pay period . . . information stating the employee's current amount of" ESST used during

19

the pay period and the employee's "total" amount of unused but accrued ESST.  Minn. Stat. § 181.9447, subd. 10(b).

56.     Employees may use ESST for a broad range of reasons, including, but not limited to, the employee or the employee's family members' "mental or physical illness, injury or other health condition"; "diagnosis, care, or treatment of a mental or physical illness, injury, or health condition"; "preventative medical or health care"; and needs stemming from domestic violence, sexual assault, or stalking.  Minn. Stat. § 181.9447, subd. 1(1)-(3).  The Minnesota Law broadly defines "[f]amily member" to include, among other people, "any . . . individual related by blood or whose close association with the employee is the equivalent of a family relationship" and "up to one individual annually designated by the employee."  Minn. Stat. § 181.9445, subd. 7(3)-(4).  Employees may also use ESST to "make arrangements for or attend funeral services or a memorial, or address financial or legal matters that arise after the death of a family member."  Minn. Stat. § 181.9447, subd. 1(1)-(2).  Employees may further use ESST if a health authority or professional has "determined  . . . that the presence of the employee or family member of the employee in the community would jeopardize the health of others because of the exposure of the employee or family member of the employee to a communicable disease, whether or not the employee or family member has actually contracted the communicable disease."  Minn. Stat. § 181.9447 subd. 1(6).  Employees may also use ESST to care for a family member if that person's "school or place of care has been closed due to weather or other public emergency."  Minn. Stat. § 181.9447, subd. 1(4).

57.    If an employee's need to take ESST is "foreseeable," then the employer cannot require more than seven-days' notice before the employee intends to take ESST leave.  But if the need is "unforeseeable," then the Minnesota Law permits employees to provide notice "as soon as is practicable."  Minn. Stat. § 181.9447, subd. 2.

58.    The Minnesota Law prohibits employers from requiring an employee to provide documentation that ESST was used for an authorized purpose unless the employee is absent for more than three consecutive workdays.  Minn. Stat. § 181.9447, subd. 3(a).  For ESST used for an employee's or the employee's family member's illness, "reasonable documentation may include a signed statement by a health care professional indicating the need for use of" ESST.  Minn. Stat. § 181.9447, subd. 3(b).  But "if the employee or employee's family member did not receive services from a health care professional, or if documentation cannot be obtained from a health care professional in a reasonable time or without added expense, then reasonable documentation . . . may include a written statement from the employee indicating that the employee" used ESST "for a qualifying purpose."  Minn. Stat. § 181.9447, subd. 3(b).

59.    The Minnesota Law prohibits employers from using an "absence control policy or attendance point system" -- like the points-based attendance systems utilized by the Airlines for most workgroups -- "to count [ESST] . . . as an absence that may lead to or result in retaliation or any other adverse action."  Minn. Stat. § 181.9447, subd. 6(b).

60.    Beginning January 1, 2025, "[a]ll paid time off and other paid leave made available to an employee by an employer in excess of the minimum amount required [by the Minnesota Law] for absences from work due to personal illness or injury" ("Additional

Leave") "must meet or exceed the minimum standards and requirements provided in" the Minnesota Law, except for the Minnesota Law's accrual requirements (the "Additional Leave Requirement"). Minn. Stat. § 181.9448, subd. 1(a).

61.    The Minnesota Law generally does not permit CBAs to waive the Minnesota Law's substantive provisions, subject to two exceptions. *First*, the Minnesota Law provides that CBAs "with a bona fide building and construction trades labor organization" can "waive" the Minnesota Law's requirements if the waiver "explicitly reference[s]" the Minnesota Law "and clearly and unambiguously waive[s] application of those sections to such employees." Minn. Stat. § 181.9448, subd. 1(f). *Second*, the Minnesota Law provides that CBAs can waive the Minnesota Law's restrictions on requiring documentation for absences in Minn. Stat. § 181.9447, subd. 3, for Additional Leave (*see supra* ¶ 60), so long as the waiver "explicitly reference[s]" the documentation subdivision "and clearly and unambiguously waive[s] application of that subdivision to such employees." Minn. Stat. § 181.9448, subd. 1(g). In this way, the Minnesota Law unfairly requires those Airlines with employees covered by CBAs to attempt to negotiate in a give-and-take process for a contractual provision stating that the Minnesota Law's restrictions on documentation do not apply to Additional Leave. Some Airlines will have to give up something costly to the union to secure a waiver of the Minnesota Law's restrictions on documentation for Additional Leave (even though the Minnesota Law -- including its restrictions on documentation -- is unlawful as applied to the Airlines). Other Airlines will be unable to secure a waiver, no matter what they reasonably offer to the union in exchange for it.

## THE MINNESOTA LAW HAS HAD AND/OR WILL HAVE A SIGNIFICANT IMPACT ON THE AIRLINES' PRICES, ROUTES AND/OR SERVICES

62.    The Minnesota Law has had and/or will have a significant impact on the Airlines' prices, routes, and/or services.  This is because the Minnesota Law has caused and/or will cause an increase in both use and abuse of sick leave and other paid time off and thereby has impacted and/or will impact the Airlines' prices, routes, and/or services, including and up to causing or contributing to flight delays and cancellations.

### The Minnesota Law Has Increased And/Or Will Increase Employee Absences

63.    The Minnesota Law's mandate of ESST encourages employees to use and potentially abuse sick leave, and thus to be absent from work more frequently, for several reasons.

64.    *First*, in many situations, the Minnesota Law allows employees to use ESST for additional reasons beyond those allowed under the applicable CBA or company policy, including, for example, to care for family members when the family member's school or place of care is closed due to weather.  Because employees are able to use ESST to take time off from work for additional reasons than are specifically permitted by the CBAs or company policies, the employees have used and/or will use ESST to take more time off from work than would be the case without the Minnesota Law.

65.    *Second*, the Minnesota Law's prohibition on counting absences towards employee discipline, *see* Minn. Stat. § 181.9447, subd. 6(b), interferes with the Airlines' enforcement of their nationwide attendance and reliability policies.  Specifically, the Minnesota Law deprives the Airlines of one of their main accountability tools -- *i.e.*, their

23

points-based attendance programs -- which assess points for employees' absences, including additional points for last-minute absences. Because points or other discipline cannot be assessed for an employee's absence, employees have been and/or will be absent from work more often and/or with less notice.

66. **Third**, the Minnesota Law's requirement that an employee must be absent for more than three consecutive work days before an employer can request medical verification of illness, *see* Minn. Stat. § 181.9447, subd. 3, practically speaking, substantially restricts the Airlines' ability to investigate the circumstances surrounding employee absences. By restricting the Airlines' ability to request medical documentation for absences, including during "sick leave emergencies" and other "critical coverage" periods, the Minnesota Law has led and/or will lead to more employee absences.

67. **Fourth**, the Additional Leave Requirement compounds the pernicious impact of the Minnesota Law. The Minnesota Law's requirement that all Additional Leave, including CBA-negotiated paid sick leave or other time off, generally must comply with the Minnesota Law's restrictions means that the Airlines cannot apply their points-based attendance policies for (the potentially thousands of hours of) Additional Leave -- paid time off which the Minnesota Law does not require employers to provide in the first place and which the Airlines only agreed to provide in tandem with their ability to enforce their accountability tools. The Minnesota Law thus effectively eliminates the Airlines' ability to use one of their most important and long-standing accountability tools in its entirety.

24

**Increased Employee Absences Caused By The
Minnesota Law Have Significantly Impacted And/Or
Will Significantly Impact The Airlines' Prices, Routes, And/Or Services**

68.    The increase in employee absences which has been and/or will be caused by the Minnesota Law has significantly impacted and/or will significantly impact the Airlines' prices, routes, and/or services, including and up to causing or contributing to flight delays and cancellations, for several reasons:

69.    *First*, increased absences among flight crew caused by the Minnesota Law has had and/or will have a significant impact on the Airlines' services, including by disrupting the Airlines' passenger boarding procedures and causing or contributing to flight delays and cancellations.  This is primarily because federal regulations require the Airlines to have a minimum number of pilots and flight attendants on-board before passengers may board the aircraft or the aircraft may take off.  *See* 14 C.F.R. §§ 121.385, 121.391.  Most of the Airlines' flights operate at the minimum staffing level for pilots and flight attendants.  Thus, for example, when a pilot or flight attendant calls out sick (including when using ESST) the Airlines must find a replacement flight crew member.  Even if a flight attendant or pilot calls out for only a few hours of a trip (including when using ESST as allowed by the Minnesota Law), the Airlines will have to replace the flight attendant or pilot for the remainder of their trip.  If there is difficulty in finding a replacement pilot or flight attendant, the flight may be delayed; and if a replacement pilot or flight attendant cannot be found, the flight may be cancelled.  Each of these service impacts directly and adversely affects the passengers' experiences while traveling with the Airlines.

70.    Moreover, because the Airlines' networks are based upon a complex array of connections and transfers, a delayed departure due to an unexpected flight crew member absence in one location can cause delays in other locations ("downline delays"). Specifically, when a plane arrives at its destination late, that delay can cascade in numerous ways, including (i) to the passengers on the delayed aircraft, who may now miss their connecting flights; (ii) to the delayed aircraft, which may cause its next scheduled flight to be delayed; (iii) to the delayed pilots, who may cause a delay in the next flight they were scheduled to operate (which may not even be on the same aircraft as before); and (iv) to the delayed flight attendants, who likewise may cause their next scheduled flights to be delayed.

71.    Even beyond downline delays, a Minnesota-based flight attendant's or pilot's absence caused by the Minnesota Law can have an adverse impact across an Airline's network for the additional reason that flight attendants and pilots can call out out-of-base. For example, if an MSP-based flight attendant calls out sick at an airport where their Airline does not have a flight attendant base, then the Airline will need to find a flight attendant living near that airport who might be able to cover the trip or, alternatively, the Airline will have to "deadhead" a flight attendant from another base (*i.e.*, flying the flight attendant to the airport from their base to cover for the absent flight attendant) or "draft" a flight attendant (*i.e.*, requiring a flight attendant to fly on their scheduled day off); all of which could cause hours' long departure delays.  If the Airline is unable to find a flight attendant to cover that MSP-based flight attendant's out-of-base sick call, the flight would have to be cancelled.

72.     Finally, increased flight crew absences caused by the Minnesota Law has had and/or will have an impact on the operational reliability of a base, which in turn affects the viability of that base for an Airline.

73.     **Second**, increased absences among ground crew caused by the Minnesota Law has had and/or will have a significant impact on the Airlines' services, including and up to causing or contributing to flight delays and cancellations.

74.     For example, increased absences among above-the-wing ground crew employees has had and/or will have a direct and significant impact on Airline services provided at:

    (a)   Ticket counters:  When there are fewer above-the-wing employees working at the ticket counter and kiosks, passengers are more likely to have to wait longer for assistance from an Airline employee, including for necessary tasks like printing boarding passes, checking baggage, or resolving other pre-departure issues.  When passengers are delayed at the ticket counter, they risk missing their flight altogether.  Moreover, when passengers are delayed at the ticket counter, they may be unable to timely check in their bags for departure.  Additionally, if there are high callouts among above-the-wing employees, Airlines may entirely shut down  certain ticket counter locations.  This can inconvenience passengers by forcing them to find a different ticket counter location, causing longer lines at open ticket counters, and leading to delayed baggage drops and passengers.

    (b)   Customer support areas:  When an Airline is experiencing high callouts among above-the-wing employees, they frequently pull employees from the customer support areas, sometimes referred to as "Need Help" centers, in the terminals.  This can lead to the Airline closing the "Need Help" centers, which negatively impacts customer service.

    (c)   Gates:  When an Airline is short-staffed at the gates, that typically means that one gate agent will have to work a gate by themselves, even though this is typically a two-person job.  This can slow the

27

boarding process and lead to a longer boarding time, which may ultimately affect a flight's on-time departure. Moreover, short-staffing can affect the aircraft arriving at the short-staffed gates, because employees working at the gates assist with deplaning.

(d)  Premium service clubs: When an Airline is short-staffed at the premium service clubs, passengers are more likely to experience longer waits to check in to the club as well as a lower level of service once inside.

75.  Likewise, increased absences among below-the-wing ground crew and cargo employees caused by the Minnesota Law has had and/or will have a direct and significant impact on Airline services, including:

(a)  Baggage loading: When the bag room is short-staffed, Airlines are sometimes forced to delay departures -- mainly on international flights -- in order to ensure that bags will make the plane, because otherwise the bags may not get to their destinations for significant periods of time. On domestic flights, the bags may not get loaded before the aircraft departs. Additionally, short-staffing in the bag room can result in misplaced bags, which also significantly impacts the Airlines' passengers.

(b)  Baggage unloading: When the bag room is short-staffed, passengers are usually forced to wait a long time for their bags to arrive at the baggage carousel.

(c)  Cargo services: When cargo agent teams are short-staffed, cargo (including, for example, urgently needed human organs for transplants, human remains, perishable goods, medications, air freight, and air mail) may not get loaded before the aircraft departs, which can result in significant consequences for the Airlines' cargo customers and, in turn, the Airlines.

(d)  Towing: When towing or move teams, which are skilled positions, are short-staffed, it will generally take longer for aircraft to be moved from the hangar to the gates, or between gates, which can lead to delayed boarding and/or departures.

(e)  Water and Lavatory services: When water and lavatory teams, which are skilled positions, are short-staffed, it will generally take longer for

the aircraft to be serviced, which can cause delayed boarding and/or departures.

(f)    Taxiing and Deplaning services:  When a ramp team is short-staffed and unavailable to meet an arriving aircraft, this can lead to gate holds, which is when an aircraft is held on the tarmac for more than ten minutes, and, among other things, that ground hold can delay connecting passengers and flight crew.

(g)    De-icing services:  When a de-icing operation is short-staffed, it will generally take longer for the aircraft to be de-iced, which can cause delayed departures.

76.    Similarly, increased absences among maintenance employees caused by the Minnesota Law has had and/or will have a direct and significant impact on the Airlines' services.  When an Airline's maintenance team is short-staffed, it will generally take longer to complete necessary maintenance tasks at the gate on aircraft scheduled shortly for departure.  This can cause delayed boarding and/or departures.  Short-staffing among a maintenance team will also lengthen the time it takes to perform scheduled or otherwise required maintenance during an aircraft's layover in Minnesota, which can cause maintenance tasks to be deferred or flights to be delayed or cancelled until the required maintenance can be performed.  Additionally, when a maintenance team is short-staffed and thus unable to complete scheduled maintenance items, the number of aircraft that are "out of service" may increase, which can lead to flight delays or even cancellations.

77.    As noted above, the impact of increased ground crew absences caused by the Minnesota Law on any one of the above-described services, alone or in combination, has affected and/or will affect yet another critical service of the Airlines:  the on-time departure of aircraft.

78.     The Airlines are forced to employ mitigation strategies to attempt to find coverage for employees who call out under the Minnesota Law.  For example, the Airlines often have a subset of flight attendants who sit on "reserve" and may be available to fill in for missing flight attendants (*e.g.*, flight attendants who are sick, but also flight attendants whose earlier flights are delayed for any number of reasons) and sometimes have a subset of "bullpen" or "overage" ground employees to fill in for missing ground employees (*e.g.*, ground employees who are sick or out on vacation).  Otherwise, the Airlines attempt to use premium, incentive, or overtime pay to dissuade employees from calling out sick in the first place.  Each of these strategies has its limitations and, alone or in combination, cannot and does not insulate the Airlines from the service impacts attributable to employee absences.  Further, each of these strategies is significantly costly for the Airlines.  The Minnesota Law requires the Airlines to incur even further costs for these mitigation strategies and/or to implement expensive changes to how they provide their services (*e.g.*, hiring more employees, staffing more reserve or standby flight attendants, staffing more "overage" ground employees, offering more premium, incentive, or overtime pay).[7]  This significant impact to the Airlines' mitigation strategies and how they provide their services is in and of itself an impermissible impact caused by the Minnesota Law, and has had and/or will have a significant impact on the Airlines' prices, routes, and/or services.

---

[7]     Additionally, the Minnesota Law has been and/or will be administratively burdensome and costly for the Airlines, including because tracking the hours that flight crew work in Minnesota is difficult due to the transitory nature of their work.

79.     Notably, two district courts have already held that paid sick leave laws, with provisions similar to the Minnesota Law's provisions, are preempted by the ADA.  In *Delta Air Lines, Inc. v. New York City Department of Consumer Affairs*, 564 F. Supp. 3d 109, 124 (E.D.N.Y. 2021), the Eastern District of New York held that compliance with New York City's paid sick time law -- which has similar paid sick leave provisions as the Minnesota Law -- would have a potential impact on "the availability of flight attendants, and thus on-time flights, a core service of the airline," and thus was preempted by the ADA.

80.     Likewise, in *Air Transport Ass'n of America, Inc. v. Campbell*, No. 18-CV-10651-ADB, 2023 WL 3773743, *12 (D. Mass. June 2, 2023), the District of Massachusetts held that Massachusetts' paid sick leave law -- which also has similar paid sick leave provisions as the Minnesota Law -- was preempted by the ADA because it "caus[ed] an increase in employees calling out sick," and had "a clear and direct impact, which is not tenuous, remote or peripheral, on the availability of the Airlines' labor force and therefore their ability to provide . . . services to customers."

81.     The Minnesota Law will significantly impact the Airlines for the additional and unique reason that it imposes the Additional Leave Requirement, which mandates that, beginning January 1, 2025, <u>all</u> Additional Leave provided to employees -- which for the Airlines could be hundreds if not *thousands* of hours accrued by each employee -- comply with the strictures of the Minnesota Law.  (*See supra* ¶ 60.)  By contrast, the New York City paid sick time law applied to only 56 hours of leave time per year, N.Y.C. Admin. Code § 20-913(b), and the Massachusetts paid sick leave law applied to only 40 hours per

year, Mass. Gen. Laws ch. 49 § 148C(d), with no restrictions or requirements with respect to how employees were allowed to use any additional leave provided by their employer.

82.     For at least the reasons discussed herein, the Minnesota Law has had and/or will have a significant impact on the Airlines' prices, routes and/or services, and thus is preempted by the ADA.

## THE MINNESOTA LAW INTERFERES WITH, AND DESTABILIZES, THE COLLECTIVE BARGAINING PROCESS

83.     The Minnesota Law intrudes upon and interferes with the collective bargaining process as envisioned by Congress, and as reflected in the RLA, for the determination of terms and conditions of employment for employees in the airline industry. As a result, the Minnesota Law is preempted.

84.     The Minnesota Law frustrates the effectuation of Congress's objectives in numerous ways, including:

(a)     By regulating in detail every aspect of the Airlines' sick leave and other paid time off policies and by interfering with myriad CBA provisions relating to compensation, timekeeping, scheduling, discipline, reliability, and absence more generally;

(b)     By mandating through legislation specific terms and conditions of employment for Airline employees, which their unions have been unable to achieve through the collective bargaining process, thereby circumventing the collective bargaining process and depriving the Airlines of the opportunity to obtain something of benefit in exchange for providing employees more generous terms of employment than the Airlines have previously agreed to provide;

(c)     By effectively altering existing CBAs by requiring the Airlines to comply with the Minnesota Law's requirements for Additional Leave that they have agreed to provide pursuant to those CBAs, even though the Minnesota Law's requirements are inconsistent with the terms of the CBAs providing the Additional Leave; and

32

      (d)    By delegating to unions the unfettered authority to determine whether Airlines must comply with the documentation requirement of the Minnesota Law for Additional Leave or, instead, whether compliance is waived through a CBA.

85.    As just one example of how the Minnesota Law interferes with the collective bargaining process, an Airline union used the legislative process to secure a benefit for its members (and all other flight crew working in or based out of Minnesota) that it was unable to achieve through the collective bargaining process.  (*See supra* ¶¶ 47-49.)

## COUNT I

## THE AIRLINE DEREGULATION ACT PREEMPTS THE MINNESOTA LAW

86.    A4A re-alleges and incorporates herein each of the preceding allegations.

87.    The Supremacy Clause, Article VI, Clause 2, of the United States Constitution states:  "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land."  U.S. Const. art. VI, cl. 2.

88.    Under the Supremacy Clause, federal law preempts any state or local regulation in an area in which Congress has expressly or impliedly exercised exclusive authority.

89.    Congress enacted the ADA in 1978 to deregulate the airline industry; to ensure maximum reliance on competitive market forces; to encourage efficiency, innovation, and lower prices; and, to meet the needs of consumers and the commerce of the United States.  To prevent states and municipalities from undoing federal deregulation of air transportation with regulation of their own, Congress enacted a broad express

preemption provision.   The ADA expressly and broadly prohibits state and local governments from enacting or enforcing "a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier."  49 U.S.C. § 41713(b)(1).

90.   The U.S. Supreme Court has held that § 41713(b)(1) is "deliberately expansive." *Morales*, 504 U.S. at 384 (citation omitted).  The ADA broadly preempts all state laws that have a "significant impact" on airline prices, routes, or services -- even if the state law is "not specifically designed to affect" airlines, and even if its "effect is only indirect," as long as it is not "too tenuous, remote, or peripheral." *Id.* at 386, 390 (citations omitted).

91.   The Minnesota Law has had and/or will have a "significant impact" on the Airlines' prices, routes, and/or services, and is therefore preempted by the ADA.

92.   ***First***, the Minnesota Law has caused and/or will cause an increase in employee absences from both use and abuse of its ESST provisions, which in turn has had and/or will have a significant impact on the Airlines' prices, routes, and/or services.  For example, such increased absences have caused and/or will cause a significant impact on numerous Airline services, including:   (i) on-time boardings; (ii) on-time departures; (iii) services at the ticket counter, at the gates, in premium service clubs, and in baggage service offices; (iv) baggage loading and unloading, aircraft towing, de-icing, servicing of water and lavatory equipment, aircraft taxiing, and deplaning; and (v) aircraft maintenance services.

93.    **Second**, these increased absences have caused and/or will cause the Airlines to change their services (*e.g.*, by reducing or altering the services provided to passengers, as discussed *supra*, to compensate for increased employee absences) and how they provide their services, including by potentially forcing them to employ mitigation strategies (*e.g.*, hiring additional employees, reworking reserve and overtime programs) to protect their operations. This impact to the Airlines' services and how they provide those services has caused and/or will cause a significant impact on the Airlines' prices, routes, and/or services.

94.    Because the Minnesota Law impermissibly relates to the Airlines' "prices, routes, or services," the ADA preempts the Minnesota Law in its entirety. As a result, the Minnesota Law violates the Supremacy Clause of the United States Constitution. Accordingly, A4A is entitled to a judgment declaring that the Airlines are not subject to the Minnesota Law and an injunction against enforcement thereof.

## COUNT II

## THE RAILWAY LABOR ACT PREEMPTS THE MINNESOTA LAW

95.    Plaintiff re-alleges and incorporates herein each of the preceding allegations.

96.    A state or local law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *see also United Steelworkers of Am. AFL-CIO-CLC v. Johnson*, 830 F.2d 924, 929 (8th Cir. 1987) (en banc). Federal labor law, whether the National Labor Relations Act, 29 U.S.C. §§ 151-169, or the RLA, preempts state and local laws which intrude upon the collective bargaining process -- but it does not preempt minimum labor standards. *See generally 520 S. Mich. Ave. Assocs., Ltd. v. Shannon*,

549 F.3d 1119, 1128 (7th Cir. 2008).  Because the Minnesota Law interferes with the collective bargaining process in numerous respects and does not qualify as a minimum labor standard, it is preempted by the RLA.

97.     **First,** the Minnesota Law frustrates the congressional objectives of the RLA and interferes with the collective bargaining process in numerous respects.  For example:

(a)     The Minnesota Law imposes a pervasive scheme of regulation with respect to numerous aspects of the working relationship between Airlines and their employees, in derogation of the terms of CBAs carefully negotiated over long periods of time between the Airlines and the unions representing the Airlines' employees.  In particular, the Minnesota Law does much more than simply require a specified amount of paid sick leave or other paid time off.  Instead, it regulates in painstaking detail every aspect of the Airlines' sick leave and personal leave policies and, in so doing, interferes with myriad CBA provisions relating to subjects such as compensation, timekeeping, scheduling, discipline, reliability, and absence more generally.

(b)     The Minnesota Law mandates through legislation specific terms and conditions of employment for Airline employees which their unions have been unable to achieve through the collective bargaining process.

(c)     The Minnesota Law delegates to unions the unfettered authority to determine whether, as applied to Additional Leave, the Airlines must comply with the Minnesota Law's restrictions on doctors' notes and other documentation requirements.  In particular, CBAs can waive the Minnesota Law's restrictions on documentation for Additional Leave, but only if the waiver "explicitly reference[s]" the Minnesota Law's subdivision on documentation for absences "and clearly and unambiguously waive[s] application of that subdivision to such employees."  Minn. Stat. § 181.9448, subd. 1(g).  Some of the Airlines' unions have historically not included waivers of provisions of specific state and local laws in their CBAs, and other unions have declared they are unwilling to do so in the future.  And, even if they may be willing to grant the explicit waiver required by the Minnesota Law, unions will no doubt extract a heavy price.

(d)     The Minnesota Law expresses in multiple ways an affirmative

preference for union representation of employees, rather than remaining neutral as Congress envisioned in its enactment of the federal labor laws. (*See infra* ¶ 99.)

In these and other ways, the Minnesota Law impermissibly creates "a disincentive to collective bargaining and instead encouragement for employers or unions to focus on lobbying at the state capital instead of negotiating at the bargaining table." *520 S. Mich.*, 549 F.3d at 1132-33.

98. **Second**, the Minnesota Law does not qualify as a minimum labor standard for at least the following reasons, among others.

99. As an initial matter, minimum labor standards "'affect union and nonunion employees equally, and neither encourage nor discourage the collective-bargaining processes that are the subject of'" federal labor law. *520 S. Mich.*, 549 F.3d at 1129 (*quoting Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 755 (1985)). The Minnesota Law does not do so. Instead, the Minnesota Law manifests an affirmative preference for collective representation in numerous ways. For example:

(a) The Minnesota Law permits employees "with a bona fide building and construction trades labor organization" to "waive" the Minnesota Law's requirements if the waiver "explicitly reference[s]" the Minnesota Law "and clearly and unambiguously waive[s] application of those sections to such employees." Minn. Stat. § 181.9448, subd. 1(f). But the Minnesota Law does apply in *all* instances to non-union employers in the building and construction trades.

(b) The Minnesota law permits CBAs to waive the Minnesota Law's restrictions on documentation for Additional Leave, so long as the waiver "explicitly reference[s]" the Minnesota Law's subdivision on documentation for absences "and clearly and unambiguously waive[s] application of that subdivision to such employees." Minn. Stat. § 181.9448, subd. 1(g). If, however, a non-union employer provides Additional Leave through a company policy (rather than a CBA), the

Minnesota Law does not permit the restrictions on documentation requirements for Additional Leave to be waived.

100.    Moreover, in order to qualify as a minimum labor standard, the Minnesota Law must set a "low threshold," *520 S. Mich.*, 549 F.3d at 1134, and not mandate "terms of employment that would be very difficult for any union to bargain for."  *Id.*  The Minnesota Law fails this test in numerous ways, including, but not limited to, the following:

(a)    The Minnesota Law prohibits points-based attendance systems, restricts the use of doctors' notes, and expands the reasons for which employees can use sick time -- long-standing features of Airline CBAs (and Airline policies authorized by CBAs), which unions have been unable to get the Airlines to abandon through the collective bargaining process.  Because of the Additional Leave Requirement, the Minnesota Law effectively prohibits the Airlines from using their long-standing and negotiated accountability policies, including their points-based attendance policies and doctors' notes requirements, at all.  Moreover, the Additional Leave Requirement applies only to employers who provide their employees with Additional Leave, and in that way does not set a "minimum standard" for sick leave that *all* employers must follow, *i.e.*, an employer who does not provide its employees with Additional Leave is unburdened by the Additional Leave Requirement.

(b)    The Minnesota Law provides damages for an aggrieved employee in an amount "equal to all [ESST] that should have been provided or could have been used, plus an additional equal amount as liquidated damages," as well as the recovery of attorney's fees, and costs, *see* Minn Stat. §§ 177.50, 181.944.

(c)    The Minnesota Law creates a private right of action in derogation of the grievance and arbitration procedures which are mandated by the RLA to resolve these kinds of workplace disputes, *see* Minn. Stat. § 181.944; *520 S. Mich.*, 549 F.3d at 1137 (noting that, by virtue of its provision for a private right of action, the Illinois statute held to be preempted "encourag[es] litigation rather than resolution through the mechanism established by the CBA").

101.    Additionally, the Minnesota Law does not qualify as a minimum labor standard because it is not a law of general application as it does not apply to numerous categories of employees. *See, e.g.*, Minn. Stat. § 181.9445, subd. 5.

102.    For all of the foregoing reasons, the Minnesota Law impermissibly intrudes upon and interferes with the collective bargaining process as envisioned by Congress for the determination of the terms and conditions of employment for employees in the airline industry. The Minnesota Law is therefore preempted by the RLA and, as a result, it violates the Supremacy Clause of the United States Constitution. A4A is, accordingly, entitled to a judgment declaring that the Airlines are not subject to the Minnesota Law and an injunction against enforcement thereof.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff A4A asks for the following relief:

(a)    Judgment against Defendant declaring that the Minnesota Law, as applied to the Airlines:

(i)    is preempted by the Airline Deregulation Act, and is therefore unenforceable by virtue of the Supremacy Clause of the United States Constitution; and

(ii)    is preempted by the Railway Labor Act, and is therefore unenforceable by virtue of the Supremacy Clause of the United States Constitution.

(b)    Permanent injunctive relief prohibiting enforcement of the Minnesota Law against the Airlines.

(c)    An award to A4A for its attorneys' fees and costs incurred in this action under any applicable law.

(d)    Any other relief the Court may deem just and appropriate.

Dated:  December 30, 2024

Chris A. Hollinger (*pro hac vice* forthcoming)
Molly Edgar (*pro hac vice* forthcoming)
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, California 94111
Telephone: (415) 984-8700
chollinger@omm.com
medgar@omm.com

Mike Rosenblatt (*pro hac vice* forthcoming)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
mrosenblatt@omm.com

Respectfully submitted,

*s/ Leah C. Janus*

Leah C. Janus (0337365)
Alethea M. Huyser (0389270)
FREDRIKSON & BYRON P.A.
60 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402
Telephone: (612) 492-7000
ljanus@fredlaw.com
ahuyser@fredlaw.com

James R. Carroll (*pro hac vice*
forthcoming)
Alisha Q. Nanda (*pro hac vice*
forthcoming)
Emily M. Jennings (*pro hac vice*
forthcoming)
Anne Rabon (*pro hac vice* forthcoming)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
Telephone: (617) 573-4800
james.carroll@skadden.com
alisha.nanda@skadden.com
emily.jennings@skadden.com
anne.rabon@skadden.com

*Counsel for Plaintiff*
*Air Transport Association of America, Inc.*
*d/b/a Airlines for America*